STATE OF NEBRASKA, APPELLEE, V. ANTHONY C. STARKS, APPELLANT.

533 N.W.2d 134

Filed June 13, 1995.   No. A-94-896.

Dennis R. Keefe, Lancaster County Public Defender, and Michael D. Gooch for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HANNON, IRWIN, and MUES, Judges.

IRWIN, Judge.

## INTRODUCTION

Anthony C. Starks appeals his conviction for robbery. Starks assigns as error the district court's overruling his objection to the State's use of two peremptory challenges to exclude two female potential jurors and the district court's refusal to give two jury instructions he requested. He also contends that the evidence was insufficient to submit the case to the jury. Finally, Starks claims that the district court erred in denying his motion for new trial. For the reasons stated below, we affirm.

## FACTS

We review the facts in the light most favorable to the State, as we are required to do. See *State v. Schumacher*, 240 Neb. 184, 480 N.W.2d 716 (1992). On December 17, 1993, the First Federal Lincoln Savings and Loan Association (First Federal) located in Lincoln, Nebraska, was robbed. A man ran into First Federal at approximately 1:35 p.m., threw a blue nylon gym bag at Denise Hoffman, one of the employees, and said, "Give me your money, bitch." Hoffman began putting bills into the bag. When a bank drive-through buzzer sounded, the robber grabbed the bag and ran from the building. Hoffman's cash drawer was $3,642 short after the robbery. Hoffman described the robber as a black male, with a medium build, about 5 feet 6 inches tall, and probably in his midtwenties. She said that he had on a ski mask and a scarf tied around the bottom part of his face and that the only skin she could see around the eyes was black.

About 1:30 p.m., Leslie Dale Vlcek, who was at the small engine repair shop next to First Federal, noticed a brown vehicle with a lighter brown or tan top, which he thought was an Aries K car, that was without license plates drive by once and then drive by again and stop. Vlcek saw a man who was wearing a

bandanna get out of the car and start running in the direction of the bank. Vlcek described this man as black with a muscular build and between 5 feet 9 inches and 5 feet 11 inches tall. Vlcek stated that a blonde woman remained in the driver's seat of the brown and tan car, that seconds later the same man ran back to the car, and that the car "took off."

Approximately 5 p.m. that same day at about 13th and F Streets in Lincoln, Officer Michael Pratt and Investigator Mark D. Domangue of the Lincoln Police Department met a car matching the description of the car seen by Vlcek. They began to follow this vehicle, but then they observed another vehicle which matched the description more closely, and they began to follow it. A white woman was driving the second car with a male passenger who appeared to be black. When this car pulled into the parking lot of a convenience store, the police pulled in behind it. The woman was identified as Rebecca Lowmack and arrested on an outstanding warrant. The male passenger, Roy Starks, who is Anthony Starks' brother or cousin, agreed to go to the police station to be questioned. In a search of the car, police found Lowmack's purse, which contained brochures from First Federal and receipts for jewelry purchased at Wal-Mart that day.

When questioned, Lowmack initially denied any knowledge of or involvement in the robbery. Eventually, she admitted that she had driven the car seen leaving First Federal after the robbery and that Anthony Starks had entered the bank. During questioning, she also admitted that she knew Starks was going to rob the bank.

At approximately 7:30 p.m., the police went to 916 S. 14th Street in Lincoln after receiving information from Lowmack and Roy Starks that Anthony Starks was at that location. When they approached the residence, the police saw a person they believed to be Anthony Starks standing in the doorway. It appeared that Starks had observed the police cruisers, and the police saw him move east inside the house. The police went to the back porch of the house. Through the kitchen door window, Det. Sgt. Gregory Sorenson saw Starks fumbling with pots and pans on the kitchen counter. The police knocked and announced themselves. A man named Curtis VanNote

answered the door, and the police asked that Starks step outside. Starks was then arrested. Starks was wearing two gold necklaces and two rings when arrested. With the consent of the owner of the residence, the police searched the kitchen. Officer Pratt found a bundle of currency totaling $2,708 under a cooking pan on the counter.

A jury trial commenced July 14, 1994. During voir dire, Starks objected that the State had used five of its six peremptory challenges to excuse females. Starks' counsel indicated that based upon the U.S. Supreme Court's holding in *J.E.B. v. Alabama ex rel. T.B.*, ____ U.S. ____, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994), the State could not use its peremptory challenges in a gender-biased manner. The jury panel of 24 people included 12 females. The State struck five of the females and Starks struck three. At the time of Starks' objection, he had one peremptory challenge remaining and four females remained.

Because Starks continues to challenge two of these peremptory challenges on this appeal, we restrict our review to them. One potential juror (venireperson No. 1) stated during voir dire that she had been a paralegal student and had been living in Denver, Colorado, in 1989; she acknowledged socializing with people of other races; and she stated that her best friend, whom she lived with for years, was Hispanic and that over the years she had a number of friends of different nationalities. In response to a question from defense counsel regarding whether each venireperson considered herself or himself to be a leader or a follower, venireperson No. 1 indicated that although her personality "doesn't require the spotlight" she saw herself "more as a leader" because she was not "afraid to state [her] opinion" and "go against people that are more assertive and will."

The other potential juror (venireperson No. 2) stated during voir dire that she was a consulting forester and "usually look[s] at diseased, sick trees and do[es] planting designs." It appears that venireperson No. 2 stated in her jury questionnaire form that her husband was employed by a natural resources district. Venireperson No. 2 also indicated that she was a follower "because [she] do[es]n't like the spotlight."

The trial court determined that Starks had made a prima facie case for gender-based discrimination in the State's use of its peremptory challenges and requested that the State provide gender-neutral explanations for its peremptory challenges. The prosecutor stated that he struck venireperson No. 1 because "based upon questioning and observations" she was a "quiet, but strong-willed person. And I wasn't able to figure out just exactly what her opinions on much of anything were." He further stated:

> In my memory, and went into my decision with it, she said she was a follower.
>
> She struck me as potentially a classic holdout, hung juror, in that she struck me as the type of person who neither side knew much about, who might very well go back into the court — back into the jury room, hang on to a position . . . to the extent of causing a mistrial.

The prosecutor stated that he challenged venireperson No. 2 because in answer to defense counsel's question, "Are you a follower or a leader?" she stated she was a follower because she did not like to be in the spotlight. He stated that this type of person is often

> willing to go either way with the majority. Ah, I'm not sure that that's always best for a juror to do that. She was a forester and her husband, in my memory, is full time with the NRD in Wahoo, the North Platte NRD. . . .
>
> . . . I don't have any — I don't know anybody in either one of those businesses. And for that reason or to indicate — or in those areas of study, and for that reason I wasn't able to determine what, if any, ah, commonalities there are or what sort of people those are. I've never met any. And, so, for the reason that there was an unknown and for the reason that there was a follower, I guess, I struck—made that my final strike.

Starks argued that the State's explanations were pretextual because it had not exercised its peremptory challenges to excuse male jurors who described themselves as followers and who had similar characteristics as these two female jurors.

The court accepted the explanations of the State as gender neutral and found no showing of pretext. The trial court found

that the State had not exercised its peremptory challenges in a discriminatory, gender-based manner.

At trial, Lowmack testified that in December 1993, she owned a brown, four-door 1981 Plymouth Reliant; that it did not have license plates; and that she often gave Anthony Starks rides in her car. She testified that on December 17, 1993, at approximately 10 a.m., she and Starks drove to the Havelock neighborhood in Lincoln. Starks told her to go into First Federal, pick up some brochures, ask about checking accounts, and see who was in the bank. She did as he asked, placed the brochures in her purse, and returned to the car. Lowmack told Starks that she had gotten the brochures and that two females were working.

Lowmack testified that she and Starks drove around for awhile and then headed back toward First Federal. He then told her to stop and said he was going to go in. Starks came back to the car in what "seemed like about 30 seconds later." She testified that "[h]e came runnin' up to the car. . . . And he jumped in." She said that she saw his blue tote bag "kind of sticking out from under his arm." She testified that he yelled at her to drive fast and gave her directions. At the corner of 84th and Adams Streets, Starks jumped out of the car and told her to go home. Lowmack testified that Starks returned to her trailer house about 3:30 p.m. and that he was wearing different clothes. She and Starks went to Wal-Mart, where he bought two gold necklaces and two rings. That evening, Lowmack and Roy Starks were stopped by police, and she was arrested.

The inconsistences in Lowmack's statements to the police, her sworn statements to defense counsel, and her present testimony regarding the times that the events of December 17 had occurred and what had occurred were brought out on cross-examination. During cross-examination, Lowmack admitted that during police questioning she first told police that she left her home at 9 a.m. and had gone to First Federal alone. Lowmack admitted that she did not mention Starks' involvement in the robbery to the police until Detective Sorenson asked, "It's Anthony, isn't it?" Lowmack admitted that she was charged with robbery and that the State made a written offer that allowed her to plead to the charge of being an

accessory to a felony but that at the time of trial, she had not decided whether to accept or reject that offer. She testified that as part of the offer, she could not enter a plea until after testifying in Starks' trial. Lowmack also admitted that on December 17, she furnished the police with information she knew to be false. Detective Sorensen testified that when he questioned Lowmack on December 17, she told him that she knew Starks was going to rob the bank.

During the instruction conference, defense counsel offered two proposed jury instructions. One stated the elements of the offense of being an accessory to a felony and the other stated the elements of the offense of false reporting. Defense counsel stated that he was requesting the first instruction in order to help the jurors understand the meaning of the State's offer to Lowmack and the second instruction in order to show the jurors that Lowmack's lying to the police, as brought out on cross-examination, was illegal conduct. Defense counsel stated that both instructions addressed Lowmack's credibility as a witness. The trial court declined to give either of Starks' proposed instructions.

On July 19, 1994, the jury found Starks guilty of robbery. On July 21, Starks filed a motion for new trial alleging that there were irregularities in his trial because the State exercised peremptory challenges in a gender-biased manner; the verdict was not sustained by sufficient evidence; and the trial court's refusal to instruct the jury after a proper request by the defense was error. The trial court overruled this motion August 18. On August 18, an enhancement hearing was held and the court found that Starks should be sentenced as a habitual criminal. On September 13, Starks was sentenced to serve a term of imprisonment of not less than 12 nor more than 18 years, with credit for 268 days served. This appeal timely followed.

## ASSIGNMENTS OF ERROR

Starks' assignments of error may be summarized as follows: (1) The district court erred in failing to find that the State exercised two of its peremptory challenges on the basis of gender and that the State's explanations were pretextual, (2) the district court erred in failing to instruct the jury on the elements

of being an accessory to a felony and the elements of false reporting, (3) the district court erred in finding the evidence sufficient to submit the case to the jury, and (4) the district court erred in denying Starks' motion for new trial.

## STANDARD OF REVIEW

■ A trial court's determination of the adequacy of the State's "neutral explanation" of its peremptory challenges will not be reversed upon appeal unless clearly erroneous. *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991); *State v. Edwards*, 2 Neb. App. 149, 507 N.W.2d 506 (1993).

■ All the jury instructions must be read together, and if taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

■ On a claim of insufficiency of evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Schumacher*, 240 Neb. 184, 480 N.W.2d 716 (1992).

■ In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Rosales*, 3 Neb. App. 26, 521 N.W.2d 385 (1994).

## ANALYSIS

*Peremptory Challenges.*

■ We first consider whether the district court's finding that the State had not exercised its peremptory challenges in a gender-biased manner is clearly erroneous. See, *Morrow, supra*; *Edwards, supra*. The trial court's determination as to whether a defendant has established purposeful discrimination in jury selection is a finding of fact entitled to appropriate

deference from an appellate court. *Edwards, supra*. The U.S. Supreme Court has stated:

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of credibility." [Citation omitted.] In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral [or gender-neutral] explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).

Starks also alleges that the district court erred in denying his motion for new trial, which identified the State's improper use of its peremptory challenges as one ground for new trial. The district court's determination in this regard will not be disturbed in the absence of an abuse of discretion. See *Rosales, supra*.

Starks contends that the State's explanations for excusing venireperson No. 1 and venireperson No. 2 were pretextual and, therefore, gender-biased because the State did not challenge male jurors with the same characteristics. According to Starks, the State wanted to excuse female jurors because male jurors would be more apt to accept Lowmack's testimony that she was just doing as she was told to do by Starks on the day of the robbery.

As to venireperson No. 1, Starks argues that the record shows that she identified herself as a leader, not a follower as stated in the State's explanation. Starks contends that a review of the record shows that other self-identified leaders who were male potential jurors were not challenged by the State and were indistinguishable from venireperson No. 1 except on the basis of gender. As to venireperson No. 2, Starks argues that there is no principled explanation to distinguish her, a self-identified follower, from unchallenged male potential jurors who

identified themselves as followers.

A review of the relevant case law is appropriate at this point. In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the U.S. Supreme Court held that a prosecutor's use of peremptory challenges to exclude blacks from a jury trying a black defendant violates the Equal Protection Clause of the U.S. Constitution. In *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), the U.S. Supreme Court held that a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race. The Court reasoned that a defendant may raise the equal protection rights of a juror excluded from service because racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt. *Powers, supra.*

■ The U.S. Supreme Court further extended its holding in *Batson* in *J.E.B. v. Alabama ex rel. T.B.*, _____ U.S. _____, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). In *J.E.B.*, the Court held that the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender or on the assumption that an individual will be biased in a particular case solely because that person happens to be a woman or a man. We are aware that the Nebraska Supreme Court held in *State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989), that a prosecutor's exercise of peremptory challenges on the basis of gender did not violate the Equal Protection Clause. Accord *State v. Owen*, 1 Neb. App. 1060, 510 N.W.2d 503 (1993). However, *Culver* was decided prior to the U.S. Supreme Court's decision of *J.E.B.*

■ The three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause is as follows: First, the defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race or gender. See *Hernandez v. New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). To make a prima facie showing, the defendant must show that the prosecutor has exercised peremptory challenges to remove members of the panel that are of the same gender or a cognizable racial group and that facts

and other circumstances raise an inference that the prosecutor used the challenges to exclude potential jurors based on their race or gender. See *State v. Edwards*, 2 Neb. App. 149, 507 N.W.2d 506 (1993). Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a neutral explanation for striking the jurors in question. *Hernandez, supra*. The explanation must be based on a juror characteristic other than gender or race and may not be pretextual. *J.E.B., supra*; *Hernandez, supra*. The final step is that the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Hernandez, supra*.

In applying the *Batson* test, the Nebraska Supreme Court has stated that the prosecutor's explanations need not rise to the level of a challenge for cause. *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). The prosecutor's basis for his strikes need not even rise to the level of rationality. *Id*. The trial court need not determine if the explanation is reasonable, but only that it is nondiscriminatory and is constitutionally permissible. *Id*.; *State v. Martin*, 239 Neb. 339, 476 N.W.2d 536 (1991).

As discussed above, Starks claims the State's explanations of its peremptory challenges were pretextual because the State did not challenge male potential jurors who had similar characteristics as the two excused female jurors. This particular question has not been addressed by the Nebraska Supreme Court. However, the Eighth Circuit Court of Appeals has consistently held that a litigant may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics are also challenged. *Davidson v. Harris*, 30 F.3d 963 (8th Cir. 1994), *cert. denied* ____ U.S. ____, 115 S. Ct. 737, 130 L. Ed. 2d 639 (1995); *U.S. v. Scott*, 26 F.3d 1458 (8th Cir. 1994), *cert. denied* ____ U.S. ____, 115 S. Ct. 584, 130 L. Ed. 2d 498; *Reynolds v. Benefield*, 931 F.2d 506 (8th Cir. 1991), *cert. denied* 501 U.S. 1204, 111 S. Ct. 2795, 115 L. Ed. 2d 969. A party may establish that an otherwise neutral explanation is pretextual by showing that the characteristics of a stricken black panel member are shared by white panel members who were not stricken. *Davidson, supra*; *Walton v. Caspari*, 916

F.2d 1352 (8th Cir. 1990), *cert. denied* 499 U.S. 931, 111 S. Ct. 1337, 113 L. Ed. 2d 268 (1991); *Garrett v. Morris*, 815 F.2d 509 (8th Cir. 1987), *cert. denied* 484 U.S. 898, 108 S. Ct. 233, 98 L. Ed. 2d 191. This reasoning may also be applied to cases such as the one before us involving claims that peremptory challenges were used in a gender-biased manner.

In the case before us, some of the unchallenged male potential jurors identified themselves as leaders and some identified themselves as followers, and therefore, they shared that "characteristic" with venireperson No. 1 or venireperson No. 2. However, a review of the record shows that the male jurors passed by the prosecutor did not share other characteristics of the two female jurors. Venireperson No. 1 and venireperson No. 2 both possessed at least one additional characteristic that was not possessed by unchallenged male potential jurors and that the prosecutor identified as a basis for his decision to excuse them.

Whether considered a leader or a follower, venireperson No. 1 was also challenged by the prosecutor because she was a "quiet, but strong-willed person" who appeared to the prosecutor to be a "classic holdout, hung juror." The prosecutor's explanation is supported by venireperson No. 1's explanation as to why she considered herself a leader. She stated she was not "afraid to state [her] opinion" and "go against people that are more assertive and will." Similar explanations were not given by unchallenged male potential jurors.

In addition to being a self-identified follower, venireperson No. 2 was challenged by the prosecutor because she was a forester and her husband worked with a natural resources district and the prosecutor did not know anyone in these businesses. For this reason, the prosecutor explained that she was an "unknown." The record does not show that any unchallenged male jurors had a similar background.

Because the above characteristics of two female jurors were not possessed by unchallenged male potential jurors, the two groups are not comparable in that there are characteristics distinguishing them other than gender. Therefore, we conclude that the trial court's determination that the prosecutor's explanations were gender neutral was not clearly erroneous and

that the trial court did not abuse its discretion in denying Starks' motion for new trial on this basis.

*Starks' Proposed Jury Instructions.*

Starks also contends that the district court erred in refusing to include his two proposed instructions regarding the elements of the offenses of being an accessory to a felony and false reporting. Starks' theory for the inclusion of these instructions apparently was to affect the jurors' perception of the credibility of witness Lowmack.

All the jury instructions must be read together, and if taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

In the case before us, the inclusion of Starks' proposed instructions regarding the elements of the two crimes allegedly committed by Lowmack would not have been proper. The Nebraska Supreme Court has held that a jury instruction which misstates the issues and has a tendency to confuse the jury is erroneous. *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994); *Danner v. Myott Park, Ltd.*, 209 Neb. 103, 306 N.W.2d 580 (1981). " 'It is more than mere probability that an instruction on a matter not an issue in the litigation distracts a jury in its effort to answer legitimate, factual questions raised during trial.' " *Long*, 246 Neb. at 552, 520 N.W.2d at 199 (quoting *Bump v. Firemens Ins. Co.*, 221 Neb. 678, 380 N.W.2d 268 (1986)).

Jury instructions regarding the elements of crimes of which a defendant is not accused misstate the issues, and such instructions would have tended to confuse and distract the jury in this case. The jury instructions given were an accurate statement of the law. The jury instruction regarding the evaluation of the credibility of witnesses that was given to the jury provided an appropriate means to determine the weight of Lowmack's testimony. In addition, Starks had cross-examined Lowmack at length regarding these alleged offenses, and Lowmack had admitted to them. Therefore, we find that the

district court did not commit prejudicial error in refusing to give Starks' proposed instructions or abuse its discretion in denying his motion for new trial on this basis.

*Sufficiency of Evidence.*

Starks assigns as error that the evidence was insufficient to submit the case to the jury. Starks also assigns as error the district court's denial of his motion for new trial. One of the grounds for his motion for new trial was that the evidence was insufficient to support the guilty verdict. Although Starks' assignment of error regarding his motion for new trial is generalized and vague, specific contentions are set forth in his brief, and the State in its brief argued in response to these contentions. See *State v. Harper,* 2 Neb. App. 220, 508 N.W.2d 584 (1993). In the interest of providing a full and complete appellate review, we will address both alleged errors.

In a criminal case, a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Dyer,* 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Schumacher,* 240 Neb. 184, 480 N.W.2d 716 (1992). On a claim of insufficiency of evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. *Schumacher, supra; State v. Fleck,* 238 Neb. 446, 471 N.W.2d 132 (1991). Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *Id.*

In determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. *Schumacher, supra.* A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *Id.*

Upon an examination of the evidence, which is construed

most favorably to the State in light of Starks' conviction, we conclude that the conviction is based on sufficient evidence. The testimony of Lowmack places her and Starks at First Federal at the time of the robbery. Lowmack's testimony, along with that of Hoffman and Vlcek, describing the events surrounding the robbery supports the conclusion that Starks committed the robbery. The testimony of the witnesses and the police and the physical evidence corroborated Lowmack's testimony. The testimony of the police that $2,708 was found where Starks, an unemployed man, was seen fumbling on the counter and that Starks had spent approximately $460 at Wal-Mart earlier that afternoon also supports the conclusion that Starks committed the robbery.

The evidence against Starks and the evidentiary inferences for the State warranted submission of the case to the jury. Therefore, the district court correctly overruled Starks' request for a directed verdict. We conclude that the State presented evidence sufficient to sustain Starks' conviction.

Finding no merit to any of Starks' assigned errors, we affirm.

AFFIRMED.