STATE OF NEBRASKA, APPELLEE, V. LESLIE E. COLLINS, APPELLANT.

583 N.W. 2d 341

Filed June 16, 1998.   No. A-97-984.

Chris M. Arps for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

SIEVERS, MUES, and INBODY, Judges.

MUES, Judge.

## I. INTRODUCTION

Leslie E. Collins was convicted of two counts of first degree sexual assault. Count I charged that Collins, being a person of 19 years of age or older, did subject S.C., a person of less than 16 years of age, to sexual penetration. Count II charged that Collins subjected J.C. to sexual penetration when Collins knew or should have known that J.C. was mentally or physically incapable of resisting or appraising the nature of Collins' conduct. Collins was sentenced to 15 to 25 years' imprisonment on each count, with the sentences to be served consecutively. On appeal,

he alleges that there was insufficient evidence to convict him of count II, because the State failed to prove that he knew or should have known that J.C. was mentally incapable of resisting or appraising the nature of Collins' actions, and that his sentences on both counts are excessive.

## II. PROCEDURAL BACKGROUND

On August 1, 1996, Collins was charged in the county court for Douglas County, and on August 29, 1996, an information was filed against Collins in the Douglas County District Court, charging him under Neb. Rev. Stat. § 28-319(1)(b) and (c) (Reissue 1995) with first degree sexual assault. These charges stemmed from reports from Collins' stepdaughters regarding a pattern of sexual abuse spanning the past decade.

At a hearing on Collins' motion to suppress, Michael Hoch, a 29-year veteran of the Omaha Police Division, testified that he had interviewed S.C. and J.C. on July 24, 1996; that S.C., who was born on August 4, 1974, and was almost 22 at the time of the interview, had given him information that included dates and locations of sexual assaults by Collins from the time S.C. was 10 years old; and that J.C., who was born on March 3, 1972, and was age 24 at the time of the interview, had also reported that she had been sexually assaulted by Collins and was able to give specific dates and locations of these assaults. After these reports, Hoch had S.C. tape-record a telephone conversation between S.C. and her mother, Rita, concerning the sexual assaults. This evidence corroborated the reports of S.C. and J.C., thus a search warrant was obtained for the Collins' residence, and Collins and his wife, Rita, were taken into custody.

Hoch testified that shortly after Collins' arrest and the subsequent search of his residence, Collins was interviewed by Hoch, who told Collins his purpose was to interview him in connection with allegations regarding sexual assaults of J.C. and S.C. Hoch advised Collins of his rights and explained the charges and the evidence that had been obtained. Hoch testified that during a brief interview, Collins stated that his daughters were being truthful, that he had sexually assaulted them, and that he did not want to cause any more harm or trauma to them; that he did not want Rita involved or hurt any more and did not want to

hurt his patients; and that he wanted to get on with the process so that he could address his problem and get help. Hoch testified that Collins appeared to be calm and in control of himself, declining to give a tape-recorded statement because he felt nauseated by the subject matter of the interview.

The motion was overruled, and a bench trial was held on May 12 and 13, 1997. At trial, exhibits 1 to 4 were offered in the form of testimonial stipulations. Exhibit 1 is Hoch's report of his interview with J.C. Exhibits 2 and 3 are reports of interviews with S.C., and exhibit 4 is a report of Hoch's investigation, including summaries of his interviews with Collins and Rita. It was stipulated that if these witnesses were called, their testimony would be substantially similar to that which is contained within these reports. No objections were made, and all four exhibits were received into evidence. Both parties rested, and trial was continued to the next day.

Collins renewed his motion to suppress and presented an oral motion to dismiss; both motions were overruled. Following closing arguments, the trial court found that J.C. was born on March 3, 1972, and S.C. was born on August 4, 1974; that the complaints were filed in county court on August 1, 1996, and in district court on August 29, 1996; that under Neb. Rev. Stat. § 29-110(2)(b) (Reissue 1995), a complaint for first degree sexual assault must be filed within 7 years of the offense or within 7 years of the victim's 16th birthday, whichever is later; that according to the information most favorable to Collins, his conduct with S.C. had ended sometime in 1994 and, thus, that neither prong of the statute of limitations barred prosecution for his sexual assault of S.C.; and that according to the information most favorable to Collins, his conduct with J.C. ended in late 1994 or early 1995 and, thus, that Collins could be prosecuted for his sexual assault of her at that time because it had not been 7 years since that act. The court further found that J.C., who had been subjected to abuse starting when she was 13, was subject to manipulation by Collins, who, by virtue of his professional training and trusted position as her stepparent, abused his position of trust. Based on all the evidence, the trial court concluded that "the defendant knew or should have known that these two children, and they were children, were, in fact, mentally inca-

pable of resisting or appraising the nature of this conduct" and found Collins guilty of both counts. The trial court ordered a presentence investigation, including a 90-day evaluation at the Lincoln Regional Center. On September 5, 1997, Collins was sentenced to 15 to 25 years' imprisonment on each count, the sentences to run consecutively.

## III. FACTUAL BACKGROUND

Collins is a psychotherapist who specialized in treating victims of sexual abuse. Collins and Rita were married in 1984 and had their own psychotherapy business. Collins also worked at Boys' Town, where he helped children with sexual abuse problems. He has written three books dealing with sexually abused youths. Rita had two children, J.C. and S.C., from a former marriage. J.C., born March 3, 1972, and S.C., born August 4, 1974, were, respectively, 12 and 10 at the time of Collins' marriage to Rita.

Exhibit 1 reflects that Collins started touching J.C. inappropriately when she was 12 or 13, and this abuse escalated and eventually progressed into having sexual intercourse twice a week when J.C. was 17. J.C. turned 17 in March 1989. Collins stated that intercourse continued until J.C. ended her relationship with him in late 1994 or early 1995. The abuse continued through visits and "phone sex" after she went to Dartmouth College. She stated that on several occasions, she told Collins she wanted to stop or did not want to have sex with him and that he would become agitated and have long talks with her. On one such occasion, he sat up with her half the night with a knife in his hand and threatened to kill her, stating that nobody would care or know. He also told her that she had nothing to be angry about because he had not raped her and that if she wanted something to be angry about, he would rape her.

In 1992, when J.C. was in Omaha on a visit from Dartmouth, Collins sexually penetrated both her and her sister in a bedroom in the basement of their home. On two occasions in 1993, Collins visited J.C. in Boston, and sexual penetration occurred. In early 1994, J.C. told Collins that she did not want to see him anymore. Collins continued to call her, but she refused to have further contact with him. He admitted having sexual intercourse

with J.C., until she cut off their relationship. He also admitted asking her to photograph or videotape her sexual relationships with other persons and discussing these relationships with her.

The abuse of S.C. is reflected in exhibits 2 and 3. Inappropriate touching began with S.C. when she was 10 and progressed to sexual penetration when she was 13. She related an incident where Collins accused her biological father of being a child molester because she had taken a shower with him. S.C. confronted Collins about molesting her, and he explained that he was only teaching her, looking out for her best interests, and doing it with love and, thus, that he was not a molester. The abuse occurred on a daily basis every time her mother would leave the house and whenever Collins would drive her to his office. S.C. stated that Collins encouraged her to have sexual intercourse with every boy she dated and that he also questioned her about her sexual partners and asked her to photograph and videotape her relationships with other persons. She broke off her relationship with Collins shortly after their last sexual encounter, which occurred in December 1994, while she was home on a visit from college at Oberlin Conservatory.

Collins did not deny any of the abuse. In fact, he admits that the abuse occurred over the past decade essentially as the girls described it. He also describes himself as being a very controlling person. Collins admitted that he would have one girl wait downstairs to watch for their mother while he was upstairs having sexual intercourse with the other. He admitted asking the girls to photograph their sexual encounters with other persons, even obtaining a camera for them to do so. He admitted to sexual penetration of both girls in 1992. During his abuse of both victims, he assured them that he was just teaching them about proper sexual relationships and how to enjoy their sexuality. The girls felt that he kept them under his control even after they left for college, because he called them several times a day and because the sexual abuse occurred whenever they saw him.

## IV. ASSIGNMENTS OF ERROR

Restated, Collins asserts that (1) the trial court erred in convicting him of sexually assaulting J.C., because there is not sufficient evidence of her mental incapacity to consent to the sex-

ual acts and because the statute of limitations had run on the crime charged; and (2) his sentences on both counts are excessive. Collins does not challenge his conviction on the assault charge relating to S.C.

## V. STANDARD OF REVIEW

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence, but considers the evidence in the light most favorable to the successful party. *State v. Bush*, 254 Neb. 260, 576 N.W.2d 177 (1998).

On questions of law, a reviewing court has an obligation to reach its own conclusions independent of those reached by the lower courts. *State v. Howell*, 254 Neb 247, 575 N.W.2d 861 (1998).

A sentence imposed within the statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Turco*, 6 Neb. App. 725, 576 N.W.2d 847 (1998).

## VI. DISCUSSION

### 1. SUFFICIENCY OF EVIDENCE

#### (a) Statute of Limitations and Venue

Collins argues that the State has failed to prove any sexual penetration of J.C. after 1988 and, thus, that the prosecution is barred under § 29-110, which sets a 7-year statute of limitations for sexual assault. This assignment of error is without merit. The evidence includes a detailed account of an act of sexual penetration of J.C. by Collins in Omaha in 1992. The outside time period still within the statute of limitations was August 1989. This incident is referred to in J.C.'s report to the police and admitted to by Collins in his interview with Hoch.

In addition, Collins admits that his sexual relationship with J.C. continued generally until she ended the relationship in late 1994 or early 1995, with no specific restriction noted on what state it took place in. Collins argues that the last acts of sexual penetration, in 1993, which were proved by the State, occurred outside of Nebraska and, thus, that he is not subject to prosecution for such acts in the Nebraska courts. It is true that the evidence does show such acts occurring in Massachusetts.

However, we need not decide the venue issue. See *Motor Club Ins. Assn. v. Fillman*, 5 Neb. App. 931, 568 N.W.2d 259 (1997) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it). The State has clearly proved an act of sexual penetration in the State of Nebraska within 7 years of filing the charge.

### (b) Capacity to Resist or Appraise

#### *(i) Generally*

Regarding J.C., Collins was charged with violating subparagraph (b) of § 28-319(1), which provides: "Any person who subjects another person to sexual penetration . . . (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct . . . is guilty of sexual assault in the first degree." For a successful prosecution of Collins, the State had to prove the following elements: (1) Collins sexually penetrated J.C. and (2) Collins knew or should have known that J.C. was mentally or physically incapable of resisting or appraising the nature of Collins' conduct.

Collins' arguments on this assignment of error essentially come down to this: While the State was not required to prove a lack of J.C.'s consent to the act (as it would have if Collins had been charged under § 28-319(1)(a)), it was required to prove that she was mentally incapable of resisting or that her consent was invalid. He argues that § 28-319(1)(b) is designed to proscribe sexual penetration only "with the very young, the very old or the insane." Brief for appellant at 11. He relies on what he calls a "survey of cases under similar statutes in other states," which, while not citing them, he claims generally involved victims who were residents of rest homes or mental institutions or were mentally retarded. *Id.* He points out that the State offered no psychiatric, psychological, or other medical evidence to establish that J.C. was mentally or physically incapable of resisting or understanding Collins' conduct during the time period which must be considered, that is, within the 7 years before August 1996 or from August 1989 forward when J.C. would have been 17 and older.

The State's response is essentially that Collins started "groom[ing]" J.C. at age 13, brief for appellee at 10; that before first having sexual intercourse with her at age 16 or 17, Collins digitally penetrated her and performed oral sex on her; and that he avoided prosecution for such acts under § 28-319(1)(c) (when the victim is less than 16 years of age and the actor is 19 years of age or older) because of the statute of limitations. It argues that this repeated and ongoing outrageous treatment from an early age by one who was an expert in sexually abused youths and was especially equipped to manipulate the girls carried over into the years after J.C. turned 16 and 17 and effectively rendered her physically or mentally incapable of resisting his conduct, a matter he particularly knew or should have known.

We first address Collins' implied argument that § 28-319(1)(b) protects only victims who suffer marked mental abnormality of some type or the very young or old. Statutory interpretation presents a question of law, and an appellate court is obligated to reach a conclusion independent of that reached by the trial court. *In re Estate of Peterson*, 254 Neb. 334, 576 N.W.2d 767 (1998).

Recognizing that no Nebraska criminal case has directly addressed the issue, Collins cites *Reavis v. Slominski*, 250 Neb. 711, 551 N.W.2d 528 (1996), a civil appeal involving civil tort litigation as support for his argument. *Reavis* addressed, inter alia, the legal theory of civil recovery for sexual assault which the *Reavis* court found was more properly characterized as a sexual battery. The suit arose out of an act of sexual intercourse between a dentist and his receptionist at a New Year's Eve office party. The issue of whether the receptionist consented was central to the defense. The Supreme Court recognized the general rule of tort law that consent ordinarily bars recovery for such acts because it " ' "destroys the wrongfulness of the conduct." ' " *Id.* at 719, 551 N.W.2d at 537, quoting *Schieffer v. Catholic Archdiocese of Omaha*, 244 Neb. 715, 508 N.W.2d 907 (1993). In finding that the trial court properly overruled the dentist's motion for a directed verdict, a plurality of the Supreme Court found that reasonable minds could differ on the issues of whether the receptionist consented to the intercourse and

whether, if she did, such consent was "effective." *Reavis v. Slominski*, 250 Neb. at 721, 551 N.W.2d at 538. As support for her claim that she did not consent or that her consent was not effective, the receptionist presented evidence of childhood abuse together with expert testimony of a psychiatrist and a psychologist that these experiences undermined her ability to resist unwanted sexual contact. The Supreme Court concluded that there was some evidence that the receptionist "lacked the capacity to give effective consent." *Id.* at 724, 551 N.W.2d at 539.

In discussing consent as a defense, the *Reavis* court observed:

> "To avoid liability, consent must be effective." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 at 114 (5th ed. 1984). Consent is ineffective if the person lacks capacity to consent to the conduct. *Id.*; Restatement (Second) of Torts § 892 A(2)(a) (1979). "Generally . . . one who has reached the age of majority can give an effective consent to all kinds of conduct unless the defendant knows or has reason to know of some kind of abnormality, temporary or permanent, of the consenting person." Keeton et al., *supra*, § 18 at 114. Note that there are two aspects to the effectiveness of consent: abnormality on the part of the alleged victim and knowledge on the part of the alleged attacker.

*Id.* at 721, 551 N.W.2d at 538.

With regard to § 28-319(1) and Nebraska criminal law on the subject, the *Reavis* court had this to say:

> In Nebraska, any person who subjects another person to sexual intercourse or sexual contact who knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct is guilty of sexual assault. Neb. Rev. Stat. §§ 28-319(1) and 28-320(1) (Reissue 1989). The lack of the victim's consent is not an element of the crime of sexual assault when the victim is incapable of resisting or of appraising the nature of his or her conduct. *Id.*; *In re Interest of J.M.*, 223 Neb. 609, 391 N.W.2d 146 (1986).
>
> In criminal law, the issue of the extent and degree of abnormality required to render a victim's consent ineffec-

tive has been hotly debated. See, e.g., Annot., Rape or Similar Offense Based on Intercourse With Woman Who Is Allegedly Mentally Deficient, 31 A.L.R.3d 1227 (1970); *State v. Olivio*, 123 N.J. 550, 589 A.2d 597 (1991); *State v. Sullivan*, 298 N.W.2d 267 (Iowa 1980). Some jurisdictions follow an expansive interpretation and hold that unless one understands both the physical elements of sex and the moral quality of the conduct, then one is not capable of giving effective consent to sexual contact. *State v. Olivio, supra.* Other jurisdictions are less protective of the mentally disturbed or handicapped and construe the effectiveness of consent based upon an understanding of its physiology alone. It would appear that issue of effective consent to sexual contact is generally only raised when the victim suffers from an extreme mental handicap or deficiency.

However, Nebraska criminal law also recognizes that an otherwise competent person can be sexually assaulted if the person is physically or mentally incapable of resisting. See §§ 28-319 and 28-320.

Nebraska criminal law is consistent with the legal test for effective consent which examines whether an adult cannot give effective consent because the person suffers from a temporary or permanent abnormality. Sections 28-319 and 28-320 provide that the abnormality may be an inability to resist or the lack of understanding of the nature of sexual relations. This analysis is equally applicable in tort law.

*Reavis v. Slominski*, 250 Neb. 711, 721-22, 551 N.W.2d 528, 538-39 (1996).

*Reavis* was a plurality opinion, and the "reasoning touching on the consent issue," *id.* at 733, 551 N.W.2d at 544 (Connolly, J., concurring), was the topic of much discussion and debate in concurring and dissenting opinions joined, in some degree, by six of the seven justices.

It is apparent from the language we have quoted that *Reavis* provides both Collins and the State some support for their respective positions, and it would serve no purpose for us to "draw pictures." The bottom line is that whatever *Reavis* might

have said in analyzing the consent issue in the context of the tort of sexual battery, we do not read it as authority for the proposition that the only conduct proscribed by § 28-319(1)(b) is sexual penetration of a victim who suffers from an "extreme mental handicap or deficiency," *Reavis v. Slominski*, 250 Neb. at 722, 551 N.W.2d at 538, or as Collins argues, the very young, the very old, and the insane. We have no quarrel with the notion that § 28-319(1)(b) clearly protects such victims, but we see nothing in the language of § 28-319(1)(b) or in the reported decisions in this jurisdiction that demands such a restrictive application. See, *State v. Welch*, 241 Neb. 699, 490 N.W.2d 216 (1992) (jury properly instructed that victim's intoxication and illness could be taken into account by it in assessing victim's inability to resist or appraise nature of her conduct); *State v. Moeller*, 1 Neb. App. 1046, 510 N.W.2d 500 (1993) (upholding defendant's conviction for first degree sexual assault in part under § 28-319(1)(b) based on evidence that victim was asleep when portions of act of oral sex occurred and thus was not capable of resisting or appraising nature of her conduct). Moreover, the Nebraska Supreme Court has observed under a prior first degree sexual assault statute, § 28-319(1) (Reissue 1985), that a victim may be "overcome in many ways short of force." *State v. Willis*, 223 Neb. 844, 848, 394 N.W.2d 648, 651 (1986). See, also, *State v. Moeller, supra.*

We do not disagree with Collins that most cases brought under statutes similar to § 28-319(1)(b) do not customarily involve physically and mentally healthy victims 17 years old or older who possess the intellectual prowess apparent in J.C. and who have engaged in repeated sexual conduct with the offender over a period of years. Regardless, we do not read *Reavis v. Slominski, supra*, as authority for restricting the application of § 28-319(1)(b) to the extent that Collins suggests.

### (ii) Expert Testimony

Next, while Collins does not specifically assign it as error, he argues that the State failed to adduce any expert testimony to establish J.C.'s mental incapacity to resist or appraise the conduct of Collins. It is clear that the State's theory of the case is that Collins essentially "brainwashed" or mentally manipulated

J.C. to the point where she was incapable either of resisting his advances or of appraising the nature of his conduct. And it is true that no effort was made by the State to provide any medical, psychological, or psychiatric testimony to support this theory. The question is whether its absence was fatal to the State's case, a question, of course, far different than whether it would have been admissible if offered. See, Neb. Rev. Stat. § 27-702 (Reissue 1995) (admissible if expert's testimony would assist trier of fact in understanding evidence or determining controverted factual issue); *Childers v. Phelps County*, 252 Neb. 945, 568 N.W.2d 463 (1997).

We have found no Nebraska case which addresses the issue of the necessity for expert testimony in a prosecution under § 28-319(1)(b), although its use is obviously not unusual. See *State v. Doremus*, 2 Neb. App. 784, 514 N.W.2d 649 (1994). Collins cites no authority on the issue. As discussed earlier, convictions under § 28-319(1)(b) have been upheld on appeal apparently absent expert testimony where the theory was that being asleep, intoxicated, or ill prevented the victim from resisting or appraising the conduct. However, here the State's theory is that J.C.'s mental ability to resist or appraise was diminished by years of Collins' manipulation and psychotherapy techniques, a theory more sophisticated and logically in greater need of expert testimony than the examples cited.

Nebraska jurisprudence recognizes several areas where the aid of expert testimony is traditionally deemed indispensable to a party's carrying his or her burden of proof. See, e.g., *Vilcinskas v. Johnson*, 252 Neb. 292, 562 N.W.2d 57 (1997) (whether specific manner of treatment or exercise of skill by physician, surgeon, or other professional demonstrates lack of skill or knowledge or failure to exercise reasonable care is matter that, usually, must be proved by expert testimony in medical malpractice cases); *Storjohn v. Fay*, 246 Neb. 454, 519 N.W.2d 521 (1994) (unless injuries are objective, expert medical testimony is required to establish cause and extent of injuries in personal injury cases); *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992) (qualified expert testimony is required under Indian Child Welfare Act in parental rights termination case on issue of whether serious harm to Indian child is likely

to occur if child is not removed from home); *State v. Carr*, 231 Neb. 127, 435 N.W.2d 194 (1989) (insanity); *Sheridan v. Catering Mgmt., Inc.*, 5 Neb. App. 305, 558 N.W.2d 319 (1997), *aff'd* 252 Neb. 825, 566 N.W.2d 110 (expert opinion indispensable to establishing causal relationship between incident and injury or disability in workers' compensation cases unless nature and effect of injury are plainly apparent); and *In re Interest of Headrick*, 3 Neb. App. 807, 532 N.W.2d 643 (1995) (mental health commitment). Naturally, the common denominator in those settings is that critical evidence or facts in issue are incapable of being understood or decided without specialized knowledge to assist the trier of fact. See § 27-702.

In *Smith v. State*, 345 So. 2d 325 (Ala. Crim. App. 1976), the defendant was charged with common-law rape of a 14-year-old girl, but the record was devoid of any reference to force or lack of consent. Alabama law was that "[i]f the prosecutrix was so mentally impotent as to be incapable of consent, then it was not necessary to prove force or lack of consent." *Id.* at 327. "The capacity to consent to intercourse presupposes the mental capability to form an intelligent opinion on the subject, with an understanding of the act, its nature, and its possible consequences." *Id.* In *Smith*, there was testimony from the victim's family that she was "retarded" and attended a school for "retarded" children. *Id.* There was also a hearsay statement given by the victim's mother that a doctor had told her the victim had a mind of a 2-year-old, but there was no evidence of her actual age at the time the doctor made the statement. No medical testimony was presented as to any mental incapacity of the victim. The Alabama Court of Criminal Appeals reversed the conviction, finding that the prosecution had failed to prove lack of consent, reasoning that the State sought to prove all material elements by inference and that expert testimony of the mental capacity of the victim was "sorely needed." *Id.* at 328. It noted, however, that in a proper case, a jury might well draw the inferences necessary to convict without such testimony.

A similar view is seen in *State v. Schaller*, 1997 WL 686219 (Tenn. Crim. App.). There, the Tennessee Court of Criminal Appeals addressed the defendant's claim that the evidence was insufficient to convict him of "sexual battery," *id.* at *1, a crime

defined under the pertinent statute as "unlawful sexual contact with a person that the defendant knew or had reason to know was mentally defective." *Id.* at *3. The defendant argued that the State failed to prove the 13-year-old victim was "mentally defective." *Id.* Mentally defective was defined by statute as a mental disease or defect which renders the person temporarily or permanently incapable of appraising the nature of his or her conduct. As sufficient to meet its burden, the State relied on testimony from a detective to the effect that the victim " 'appeared to be mentally challenged' "; testimony from an employee of a foster care program, which trained parents to deal with children with special emotional needs, that the victim was " 'mentally challenged' "; and the victim's conduct while testifying. *Id.*

The *Schaller* court concluded that no rational juror could find beyond a reasonable doubt that the victim suffered from a mental disease or defect which rendered her mentally incapable of appraising the nature of her conduct. The court then recalled a prior case where the victim was shown to have had irreversible brain damage where the court had concluded that the evidence was not sufficient to show beyond a reasonable doubt that she was incapable of appraising the nature of the sexual conduct. It had concluded in that prior case that proof that meets the statutory definition of mentally defective should ordinarily come from a psychologist, psychiatrist, or other expert medical personnel, and the court applied such rule.

The case of *State v. Summers*, 70 Wash. App. 424, 853 P.2d 953 (1993), illustrates a more flexible view. In *Summers*, the Washington Court of Appeals rejected the defendant's argument that expert testimony was indispensable to prove mental incapacity and causation necessary to support a conviction under Washington's statute. The statute provided: " 'A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person: . . . (b) When the victim is incapable of consent by reason of being . . . mentally incapacitated[.]' " *Id.* at 428 n.3, 853 P.2d at 955 n.3. Washington statutes defined "mental incapacity" as that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual inter-

course whether that condition is produced by illness, defect, the influence of a substance, or from some other cause.

The victim in *Summers* was a 44-year-old female who resided in a "congregate care facility" for the mentally ill. *Id.* at 426, 853 P.2d at 954. After noting that the operative statute did not expressly require expert testimony to prove mental incapacitation, the Washington Court of Appeals held that expert testimony was not required to establish the victim's mental incapacity in that case and that the evidence was sufficient to sustain the conviction. In so doing, the *Summers* court found that a victim's mental ability is not always a topic requiring expert testimony and that while such testimony may be probative, and indeed required in some factual situations, there was no sound basis to require that it was necessary in every case.

We believe the approach in *Summers* is the better one. Whether expert testimony as to a victim's mental or physical capacity to resist or to appraise the nature of the perpetrator's conduct is indispensable in a prosecution under § 28-319(1)(b) must be approached on a case-by-case basis. In those cases such as the present case, where no expert testimony is provided, a court must examine the evidence and determine whether the nonexpert testimony is of sufficient probative value to justify a rational finding that the victim was mentally or physically incapable of resisting or appraising the actor's conduct. As hereafter discussed, we conclude that the absence of expert testimony here does not render the evidence insufficient to sustain Collins' conviction for first degree sexual assault of J.C.

### (c) Sufficiency Generally

On a claim of insufficiency of evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Starks*, 3 Neb. App. 854, 533 N.W.2d 134 (1995). In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, but considers the evidence in the light most favorable to

the successful party. *State v. Bush*, 254 Neb. 260, 576 N.W.2d 177 (1998). A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Starks, supra.*

J.C. turned 17 in March 1989, a few months before August 1989. The latter date is the commencement of the 7-year period during which Collins' acts of penetration of J.C. would fall within the applicable statute of limitations. According to Collins, he first had sexual intercourse with J.C. at age 17, and the evidence is clear that sexual penetration in various forms repeatedly occurred thereafter up to at least 1994 and in Nebraska at least as late as 1992 when J.C. was home from college for a visit. In March 1992, J.C. turned 20. Collins argues that J.C., an intelligent Dartmouth graduate, was fully capable of consenting to the sexual encounters with him and did. However, he ignores that at various points of time within the relevant time periods, J.C. was 17 to 19 years of age and not yet a "Dartmouth graduate" but a high school teenager. Moreover, he ignores that J.C. was only 13 years old in 1985 when the abuse began. Although the pre-August 1989 conduct was not the charged conduct, it takes no particular expertise to rationally conclude that this bizarre pattern of "counseling" and manipulation by someone of Collins' expertise, training, and experience had a profound effect on J.C.'s capacity to comprehend the perversity of this relationship or to resist Collins' sexual advances. We recount the evidence briefly, avoiding to the extent feasible the sordid details.

The abuse of J.C. started shortly after her mother and Collins were married. After a conversation with Collins about her biological father and a possible sexual assault, Collins assured her that he would help her learn about having normal healthy sexual responses. As part of this "treatment," he began taking her to his office at Creighton University to show her films and videos concerning human sexuality. Eventually, he began to show her pornographic films and started touching her inappropriately and encouraged her to touch herself. Eventually, this treatment progressed to the family home, where Collins would engage in long conversations concerning healthy sexual responses. J.C. described this as "nothing more than a bunch of psycho babble."

The sexual contact escalated to penetration of various types with Collins explaining that these acts would help J.C. mature in her knowledge of sexuality. Sexual intercourse started when J.C. was 16 or 17 years of age, and the "relationship" continued to at least 1994, with Collins telling J.C. that it would stop at some designated point in time, but when that time came, he would reestablish a new parameter. On several occasions, J.C. told Collins she wanted to stop or did not want to have sex with him, and he became very agitated, followed by long periods of "psycho babble." On one of these occasions, date unstated, Collins sat up almost an entire night holding J.C.'s hand, with a knife in his other hand, and threatening to kill her. He told her that no one would care or know and that she had nothing to be angry about because he had not raped her, but that if she wanted something to be angry about, he would rape her. Collins twice threatened to kill one of J.C.'s boyfriends if she did not cooperate, a threat she took seriously because of his stories of having at one time been involved in various subversive activities, including spying and the CIA. Even after J.C. essentially ended her relationship with her family, Collins insisted on calling her, expressing hope of rekindling the relationship.

Even Collins described himself as a very controlling individual, desiring to maintain complete control over his entire family, and admitted "grooming" J.C.'s younger sister, S.C., for these acts. It is apparent that he did the same with J.C. Collins' stated perception that the girls' trust in him escalated with the sexual contact evidences a surreal plot to seduce through cunning and fear, a scheme which met with much success on his part.

### (d) Resolution

In sum, the evidence viewed most favorably to the State is that Collins, a highly trained psychotherapist who specialized in treating sexually abused youth, used the tools and techniques of his trade to mold both of these young girls into his sexual robots. As a father figure, he set about "grooming" them at a very young age to accept that this was a normal, healthy sexual relationship that would lead to maturity and happiness. We believe the evidence is ample to establish that Collins' manipulation and deception of J.C. rendered her incapable of resisting or appraising the real nature of the sexual penetration that he

visited upon her during the relevant time period. Moreover, that someone of Collins' training knew or should have known of such diminished capacity needs no further discussion. This assignment of error is without merit.

## 2. EXCESSIVE SENTENCES

Finally, Collins argues that his sentences are excessive. Collins was convicted of two counts of first degree sexual assault, each of which is a Class II felony punishable by 1 to 50 years' imprisonment. The trial court sentenced Collins to 15 to 25 years' imprisonment on each count, with the sentences to be served consecutively. A sentence imposed within the statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Turco*, 6 Neb. App. 725, 576 N.W.2d 847 (1998).

Collins stresses that he has suffered loss not only of his liberty, but also of his profession, his marriage, and all of his possessions and that due to, inter alia, his lack of criminal record and cooperation, he should have received a lesser sentence. In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or lawful conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Cook*, 251 Neb. 781, 559 N.W.2d 471 (1997).

Collins is a 53-year-old man in the process of getting divorced. He has no dependents. He has a master's degree in social work from the University of Nebraska at Omaha and a Ph.D. in sociology from Yale University. He has also attended Tunghaie University in Taiwan. As stated, at the time of his arrest, he was a practicing psychotherapist who specialized in helping sexually abused youth and had authored three books on the subject. His past employment includes counseling at Boys' Town, owning a software company, and teaching sociology at Creighton University. His past criminal history consists of four speeding tickets.

We understand that Collins may indeed feel genuine sorrow for these crimes and that the shame and personal losses result-

ing from these convictions are significant punishments. Nevertheless, Collins' abuse of these girls is so bizarre that even those of us who think we have "seen it all" are appalled. And, more importantly, Collins' conduct continues to haunt the lives of both J.C. and S.C., as the presentence report reflects that each is in counseling and will require it on an ongoing basis. Collins' sentences are well within the statutory limits, and we fail to see an abuse of discretion by the sentencing court.

## VII. CONCLUSION

The evidence was sufficient even without expert testimony to convict Collins of first degree sexual assault of J.C. The sentence imposed on each count is not excessive under our standard of review. As such, the convictions and sentences are in all respects affirmed.

AFFIRMED.