**STATE**

v.

**Lionel R. GARDINER.**

No. 2004–128–C.A.

Supreme Court of Rhode Island.

April 25, 2006.

Aaron L. Weisman, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, Timothy P. Gumkowski, Office of the Public Defender, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court with respect to the entire opinion, except for Part II–F. Justice GOLDBERG, for the Court with respect to Part II–F, from which Justice FLAHERTY dissents, while concurring in the judgment.

The defendant, Lionel R. Gardiner, appeals his conviction after a jury found him guilty of the first-degree sexual assault of a developmentally disabled woman at the KG Ranch Group Home in Hope Valley, Rhode Island. Gardiner argues that the trial justice improperly vouched for the testimony of the complaining witness,

Jane.[1] He further contends that the trial justice erred when he excluded certain evidence and incorrectly instructed the jury. For the reasons set forth herein, we deny the defendant's appeal and affirm the judgment of conviction.

## I

### Facts and Travel

The events leading to Gardiner's conviction began in 1995, while defendant was employed as a community-living aide at the KG Ranch Group Home. Jane, a developmentally disabled adult woman with an IQ of approximately fifty-five, began residing at KG Ranch in September 1995, after she was relocated from another state-run home where she had been placed after her father had died and her mother no longer was able to care for her.[2]

Brenda Fugere was the group home manager at KG Ranch when Jane arrived in 1995. At trial, Fugere testified that Jane had a lot of "emotional problems" and that she had a habit of making false accusations. This testimony was buttressed by nurse Judith Mendelsohn, who testified that Jane had accused Fugere of kicking and bruising her. Mendelsohn knew this accusation to be false, however, because she personally had examined Jane when she arrived, and the bruise in question was present at that time. Jane also reported that a male patient had touched her in her genital area, even though he was "nowhere near [Jane]" when the alleged incident occurred. Because of these accusations, Fugere warned staff members to be careful around Jane.

Fugere also testified that in the fall of 1995, Gardiner reported to her that Jane was referring to him as her "boyfriend," even though he said he discouraged her from doing so. In October 1995, Jane complained to a friend that Gardiner "had taken his thing [i.e., his penis] and put it in her mouth." This information was reported to the state police, but Jane later recanted the story and said that she had lied.[3]

Approximately six months later, in April 1996, Fugere learned from two community-living aides, Patricia Levine Burdick and Richard Driscoll, that Jane had again complained of sexual contact with defendant. This time, Jane related that Gardiner had had sexual contact with her in the boiler room of KG Ranch and that Gardiner had "touched her in the butt." When Fugere spoke with Jane about this allegation, she was told that Driscoll would know about the incident because he had walked in on them as the incident was occurring.

At trial, Driscoll testified that he had, in fact, witnessed the incident in the boiler room. He explained that on a Sunday in the fall of 1995, he and Gardiner were on duty at KG Ranch. Driscoll was preparing to take some of the residents to church, and he wanted to tell Gardiner that he was leaving the premises. At first he could not find Gardiner, so he ventured around the property until he noticed that the entrance to the boiler room was ajar. This piqued Driscoll's curiosity because that door usually was closed. When he opened the door, he saw Jane bent over a chair with Gardiner standing directly behind her, both of them with their pants down. "You got to be f'ing kidding me,"

---

1. "Jane" is not the real name of the victim. We will refer to her as Jane to protect her privacy.

2. The evidence at trial established that Jane's father had physically and sexually abused her.

3. When asked about this incident at trial, Jane testified that she "didn't want him to hurt [her]," and that she "didn't want [Gardiner] to hate [her]."

Driscoll said, as he turned and walked away.

Despite his shock, Driscoll did not report the incident right away, even though it was required protocol that he do so. Because he feared that his failure to promptly report the incident would result in the loss of his job, he did not tell anyone what he had witnessed until months later, when he confided in one of his coworkers, Patricia Levine Burdick. Neither he nor Burdick reported the incident at that time, and it remained secret until Jane herself came forward with allegations of abuse on April 26, 1996.

On that day, Driscoll and Burdick had driven Jane to a dental appointment. As they were returning home, Jane began crying, "why did [Gardiner] have to do that to me; why did he have to touch me there?" When they arrived back at KG Ranch, Driscoll prepared a written statement describing what Jane said, but he still did not reveal that he personally had witnessed the boiler-room incident. In light of the fact that the police had dismissed their investigation of Jane's previous allegation against Gardiner, Driscoll felt it was necessary to "pad" his statement to make it more believable, so in addition to the boiler-room incident, he falsely reported that Jane also had complained of being abused in her bedroom.[4]

Also on April 26, 1996, Burdick informed Fugere, the KG Ranch manager, that she ought to speak with Jane. When Fugere and Jane spoke, Jane led her to the boiler room and described the events. She showed Fugere where the chair had been positioned, and said that "he [Gardiner] had put his thing in her behind." Fugere sought to clarify what "his thing" meant, and Jane said, "the thing that he goes pee with."

A formal investigation ensued, during which a doctor examined Jane, but he found no signs of trauma or penetration.[5] Given the lack of corroboration, the lack of physical evidence, and Jane's history of false accusations, no further action was taken at that time. However, months later, in the fall of 1996, Driscoll finally came forward and told a fellow employee, Robert Hayward, about what he had witnessed in the boiler room at KG Ranch. After Hayward reported the incident,[6] a criminal investigation ensued, which ultimately led to charges of sexual assault against Gardiner.

In May 2002, an indictment charged Gardiner with one count of first-degree sexual assault, occurring sometime between September 13, 1995, and April 26, 1996, and alleging that he had penetrated Jane "by force and coercion and knowing or having reason to know that the victim was mentally disabled, in violation of [G.L.

---

4. The defendant argued in a motion for new trial that Driscoll's testimony was not credible because, in addition to admitting he had falsified his statement, Driscoll was unclear on dates and he and Gardiner, who had once been friends, had experienced a falling out. In rejecting defendant's motion, the trial justice described Driscoll as "a most impressive witness," noting that he was candid, responsive, and came forward despite the fact that doing so destroyed his career.

5. Jane's exam took place on April 26, 1996, the same day she came forward with abuse

allegations. Although Jane told Fugere that the abuse had occurred two days prior, Driscoll testified that the incident had occurred several months earlier, in the fall of 1995. At trial, Fugere noted that Jane had difficulty understanding time frames.

6. Hayward waited nine days before reporting the incident described to him by Driscoll. He was initially terminated for failing to promptly report the incident, but after appealing his termination, he received a thirty-day suspension.

1956] § 11–37–2 and § 11–37–3." [7] After a six-day trial, a jury returned a guilty verdict on June 26, 2003. The defendant timely appealed.

On appeal, Gardiner argues that the trial justice committed several errors that warrant reversal of his conviction. First, he contends that the trial justice committed serious error when, in response to a question by Jane during her testimony, he told her that she was "doing fine." Second, he says that the trial justice improperly excluded evidence that Jane previously had made false allegations of physical abuse. Third, Gardiner maintains that the state failed to provide expert testimony with respect to Jane's mental condition, thus warranting acquittal on the charge that he sexually assaulted a mentally disabled person in violation of G.L.1956 § 11–37–2. Fourth, Gardiner argues that it was improper for the justice to give the jury an expert-witness instruction because there was no expert testimony at trial and, additionally, that the justice's instruction improperly vested the jury with the responsibility of determining whether one of the state's witnesses qualified as an expert. Fifth, Gardiner urges that the trial justice abused his discretion by refusing to allow a nurse's testimony that Jane was capable of consenting to sex. Finally, he asserts that it was improper for the trial justice to instruct the jury that it could find him guilty if they found that he had used threats to force Jane's sexual submission because no evidence of threats was presented at trial.

We consider each of these arguments below.

## II

## Analysis

### A. Improper Remarks by Trial Justice

■ Gardiner argues that the trial justice improperly vouched for Jane's credibility when, just before a break in her testimony, she sought assurances from the judge, and he told her in the presence of the jury that she was "doing fine." The defendant argues that this remark prejudiced him because it was an improper endorsement of a key witness's testimony. Therefore, argues Gardiner, the trial justice erred when he denied his motion for a mistrial. The remark at issue took place during the following colloquy between the judge and Jane:

"THE COURT: Right now, [Jane] and ladies and gentlemen of the jury, I think we need to take a very short break.

"THE WITNESS: Why? We're going to come back here?

"THE COURT: We'll continue with you in just a minute, but I'd like a drink of water. You might want a drink of water.

"THE WITNESS: I did have one.

---

7. General Laws 1956 § 11–37–2 provides:

"**First degree sexual assault.**—A person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, and if any of the following circumstances exist:

"(1) The accused, not being the spouse, knows or has reason to know that the victim is mentally incapacitated, mentally disabled, or physically helpless.

"(2) The accused uses force or coercion.

"(3) The accused, through concealment or by the element of surprise, is able to overcome the victim.

"(4) The accused engages in the medical treatment or examination of the victim for the purpose of sexual arousal, gratification, or stimulation."

Section 11–37–3 provides:

"**Penalty for first degree sexual assault.**— Every person who shall commit sexual assault in the first degree shall be imprisoned for a period not less than ten (10) years and may be imprisoned for life."

"THE COURT: But all of those people can't get a drink of water because they don't have cups.

"THE WITNESS: Did I do a good job?

"THE COURT: We'll be right back.

"THE WITNESS: I did a good job?

"THE COURT: You're doing fine.

"THE WITNESS: Good."

After the witness left the courtroom, the trial justice immediately instructed the jury *sua sponte* as follows:

"THE COURT: Ladies and Gentleman, I'm sure you realize that I am in no way vouching for any witness, whether it's [Jane] or someone else, and if I agree that she did a good job, that was merely so that she would not be upset. I'm certainly not in any way suggesting to you that you should believe her or not believe her, as we've discussed many times. Witness credibility and the weight of their testimony is entirely within your province and not mine. We're going to take a very brief recess. Take the jury out please."

■■■ Gardiner claims that this instruction was insufficient to cure the justice's comment that Jane was "doing fine." It is well settled, however, that a trial justice's "decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Kryla*, 742 A.2d 1178, 1186 (R.I.1999). When reviewing such a decision, we accord great deference to the trial justice because "he or she possesses 'a "front row" seat at the trial and can best determine the effect of the improvident remarks upon the jury.'" *State v. Jackson*, 752 A.2d 5, 11 (R.I.2000) (quoting *State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996)). Therefore, a trial justice's decision will not be disturbed unless it is "clearly wrong." *Kryla*, 742 A.2d at 1186.

We see nothing in the record indicating that the justice was "clearly wrong" when he denied Gardiner's motion to pass and refused to grant a mistrial. The defendant cites several cases in which this Court previously has held that a defendant was entitled to a new trial because of a trial justice's inappropriate remarks. Each of these cases, however, is so factually dissimilar to the present case that they undermine, rather than support, defendant's position.

For example, in *State v. Briggs*, 787 A.2d 479 (R.I.2001), the trial justice repeatedly expressed frustration with the defendant's lack of procedural knowledge as he argued his case *pro se*. We noted that the trial justice's remarks were "unnecessary" and "conveyed * * * hostility toward defendant." *Id.* at 482. Indeed, the trial justice's remarks continued after defense counsel entered an appearance for defendant, and the trial justice made several comments that appeared to question the attorney's competence. When the defendant testified that he did not know the identity of a drug dealer from whom his friend had purchased cocaine, the trial justice expressed his disbelief in the presence of the jury by remarking, "[t]hat's convenient." *Id.* at 483. Given the cumulative effect of the trial justice's remarks, we held that the defendant was entitled to a new trial.

Gardiner also cites *State v. Dame*, 488 A.2d 418 (R.I.1985), to support his position that the trial justice's remark warrants reversal. In that case, the jury asked a question about a witness's testimony after it had begun its deliberations. The trial justice summarized the witness's testimony for the jurors, but excluded key portions of testimony that the witness had given during cross-examination. We held that a new trial was warranted because the trial justice's summation of testimony was "in-

adequate and potentially misleading." *Id.* at 423.

To further bolster his argument, Gardiner notes that in *State v. Deslovers*, 40 R.I. 89, 116, 100 A. 64, 73–74 (1917), we held that a new trial was called for after the trial justice said that a witness under cross-examination was "trying to do the best she can."[8] At first glance, this comment may seem strikingly similar to the trial justice's comment in the present case. Upon closer examination, however, it is markedly different. Here, there is no indication that the trial justice was endorsing the veracity of Jane's testimony or the quality of her performance when he said she was "doing fine." Given the witness's obvious mental condition, the jury would have been hard-pressed to perceive this benign comment as anything other than a polite effort to assuage the worries of a child-like witness. Also, the trial justice immediately gave a curative instruction that was a model of clarity, and succinctly and unequivocally made clear that he was not endorsing the witness's credibility. *See Jackson*, 752 A.2d at 11 (trial justice's improper comment cured by contemporaneous curative instruction). This did not occur in *Deslovers*.

Because our review of a trial justice's denial of a motion to pass for making improper comments calls for considerable deference, and because the comment at issue, if prejudicial at all, was quickly followed with a proper curative instruction to the jury, we hold that the justice did not

abuse his discretion in denying the defendant's motion for new trial and to pass.

## B.  Exclusion of Recorded Recollection

■ Gardiner maintains that the trial justice committed reversible error when he excluded from evidence a document demonstrating that Jane previously had made false claims of abuse while she was at KG Ranch. When Jane arrived at KG Ranch, nurse Mendelsohn observed that Jane had bruises on her leg. However, a few days later, on September 18, 1995, Mendelsohn noted in a document that Jane claimed the bruises were the result of being kicked by Fugere, the KG Ranch manager. According to defendant, this document should have been admitted as a recorded recollection under Rule 803(5) of the Rhode Island Rules of Evidence[9] because Mendelsohn was unable to recall the circumstances described in her notes, even after counsel attempted to refresh her recollection.

Mendelsohn's notes stated as follows: "While speaking with [Jane] today, she showed me a couple of bruises on her [left] calf and told me 'Brenda kicked her.'— However, these bruises were present the day she arrived and so noted on my intake assessment." At trial, Gardiner's attorney referenced Mendelsohn's notes during the following exchange:

> "DEFENSE COUNSEL: Exactly what happened on 9–18?
>
> "WITNESS: I don't recall.

**8.** In *State v. Deslovers*, 40 R.I. 89, 116, 100 A. 64, 73 (1917), the trial justice also criticized the defense counsel when, in response to the attorney's request to be heard on an objection, the justice responded "[w]e cannot waste time that way."

**9.** Rule 803(5) of the Rhode Island Rules of Evidence provides for the admission of:

"A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence and received as an exhibit."

"DEFENSE COUNSEL: You don't recall?

"WITNESS: No.

"DEFENSE COUNSEL: Do you recall, ma'am, writing in your notes that while speaking—on September 18, 1995, that while speaking with [Jane] today, she showed me a couple of small bruises on her left calf and told me, quote, Brenda kicked her. Do you remember that?

"WITNESS: Correct.

"DEFENSE COUNSEL: Again, it's just—

"WITNESS: It's just from the notes. I don't recall the actual situation.

"DEFENSE COUNSEL: You don't recall the following statement or sentence that you made, being that, however, these bruises were present the day she arrived and so noted on my intake assessment?

"PROSECUTOR: Objection.

"THE COURT: Basis?

"PROSECUTOR: The witness says she has knowledge of this. He's leading her, essentially.

"THE COURT: Are you offering this testimony on some exception to the hearsay rule, Mr. Lovoy [defense counsel]?

"DEFENSE COUNSEL: I attempted to refresh her recollection, so yes, I'm asking that this be entered as a full exhibit.

"THE COURT: She has no memory of the event independent of the writing, so you're not refreshing her recollection.

"DEFENSE COUNSEL: Right, so I'm asking this be admitted as a full exhibit.

"THE COURT: On what theory?

"DEFENSE COUNSEL: On the theory that this has now become the testimony.

"THE COURT: Approach."

After a bench conference, Gardiner's attorney continued to cross-examine Mendelsohn:

"DEFENSE COUNSEL: So, ma'am, if I can go back to September 18, 1995, did not [Jane] say to you that Brenda [Fugere] had kicked her and showed you a bruise on her calf? Is that your—

"WITNESS: Correct, just by my note and the reason I wrote the note was to substantiate that that was not the source of the bruise."

After the jurors began their deliberations, they made a request to see the "rest of exhibits." The trial justice informed them that they already had all the exhibits they were permitted to have. Gardiner urges, however, that Mendelsohn's notes should have been included as an exhibit, and that the trial justice's refusal to admit it was reversible error. Yet there is no indication in the record that the trial justice ever ruled that Mendelsohn's notes were inadmissible; essentially, there was no ruling. If such a ruling took place off the record, then Gardiner's attorney had the burden of objecting on the record to preserve the issue for appeal. *State v. Marr*, 731 A.2d 690, 693–94 (R.I.1999) (noting issues not preserved by objection at trial are waived on appeal). He did not, and therefore we do not believe that defendant properly objected to the trial justice's ruling, or lack thereof.

We appreciate that documentary evidence, which goes into the jury room during deliberations, is at least as powerful as testimonial evidence. However, the substance of Mendelsohn's notes, which show that Jane had a history of making false accusations, ultimately came into evidence through the witness's testimony—along with an abundance of other evidence establishing Jane's propensity to make false accusations. Therefore, even if we rule that this issue properly was preserved for

appeal, the trial justice's refusal to allow Mendelsohn's notes into evidence would constitute harmless error. *See State v. Pena–Rojas*, 822 A.2d 921, 924 (R.I.2003) (holding that even if trial justice improperly excluded evidence, such error was harmless in light of other evidence); *State v. Poulin*, 415 A.2d 1307, 1311–12 (R.I.1980) (noting that the cumulative nature of evidence rendered trial justice's ruling harmless).

## C. Lack of Expert Testimony

■ Gardiner was convicted of first-degree sexual assault under § 11–37–2. As applied to the present case, this statute provides for two possible theories for conviction. Section 11–37–2(1) is applicable when the accused engages in sexual penetration with someone whom he knows or has reason to know is mentally disabled, and § 11–37–2(2) applies to sexual penetration by force or coercion. According to Gardiner, a conviction based on grounds that the victim was mentally disabled requires expert testimony, which, he contends, was not offered at trial. Therefore, argues Gardiner, his conviction should be reversed because the jury returned a general verdict of guilty, and it is impossible to know upon which grounds the verdict was based.

At trial, the state called Steven Colantuono, a psychologist who treated Jane for a period of three years. Colantuono possesses both a master's degree and bachelor's degree in psychology, as well as a law degree. In addition to working directly with Jane, he had reviewed past assessments of her condition. The witness testified that Jane had an IQ of approximately fifty-five and that her cognitive functioning

was equivalent to that of a seven-year-old child.

The record reveals that at several points during his testimony, Colantuono was asked for his professional opinion about Jane's level of development. For example, on direct examination he testified as follows:

"PROSECUTOR: Do you have an opinion, professional opinion, as to whether [Jane] is able to understand the nature of sexual activity in general?

"WITNESS: I think that she may understand some of the physical actions relating to sex, but the nature of sexual activity with respect to intimacy and the long-term kind of associations between two people, I'm not sure that she understands that. I believe that she doesn't.

"PROSECUTOR: In your professional opinion, does [Jane] have the ability to make informed decisions about appropriate physical contact between herself and others?

"WITNESS: If you mean by physical contact, sexual contact, I would say no."

Despite the prosecutor's requests for Colantuono's "professional opinion," based on his professional experience, counsel for defendant did not object to the questions posed by the state. In fact, defense counsel himself argued that Colantuono should be allowed to testify about matters of which he did not have firsthand knowledge because, in defense counsel's words, Colantuono was "testifying as an expert," and such testimony is permissible under Rule 703 of the Rhode Island Rules of Evidence.[10]

We are of the opinion that it is far too late in the day for Gardiner to now challenge Colantuono's status as an expert wit-

---

**10.** Rule 703 of the Rhode Island Rules of Evidence permits experts to base their opinions on facts or data that would otherwise be inadmissible, provided that such information is customarily relied upon by experts in the witness's particular field.

ness. In addition to electing not to object to the state's requests for Colantuono's "professional" opinion, defendant himself relied on Colantuono as an expert.[11]

The defendant further argues that even if Colantuono properly testified as an expert, his testimony was insufficient to establish that Jane was mentally disabled within the meaning of § 11–37–1(4). To fall within this definition, a person must have "a mental impairment which renders that person incapable of appraising the nature of the act." Section 11–37–1(4). Although this Court has never held that expert testimony is required to establish mental disability, such testimony was, in fact, given in this case. As noted above, Colantuono testified that Jane lacked the ability to make informed decisions about sexual contact.[12] Moreover, when the trial justice instructed the jury, he explained that the state had the burden of proving beyond a reasonable doubt that Jane was unable to understand the nature of the sexual act. He also instructed the jurors that they could determine what weight to give to Colantuono's opinion, or even disregard his testimony in its entirety. In light of the substance of that testimony, and the clarity of the trial justice's instructions, we reject defendant's argument that the evidence did not support a conviction based on mental disability.

## D. Expert Witness Jury Instruction

■ Gardiner next argues that it was improper for the trial justice to give an expert witness instruction to the jury because the state never tendered Colantuono

11. There is no precedent in Rhode Island holding that expert testimony is required to establish mental disability under § 11–37–2(1). The majority of jurisdictions addressing this issue have applied a case-by-case approach to assess whether lay evidence proffered at trial is sufficient to establish the victim's diminished mental state. *See, e.g., Jackson v. State*, 890 P.2d 587, 589–90 (Alaska Ct.App.1995) (upholding conviction for sexual assault of mentally incapable woman because testimony of victim and victim's mother was sufficient proof of victim's mental state); *State v. Summers*, 70 Wash.App. 424, 853 P.2d 953, 955–56 (1993) (holding that need for expert testimony to establish mental incapacity in rape case requires case-by-case analysis); *see also State v. Collins*, 7 Neb.App. 187, 583 N.W.2d 341, 350–51 (1998) (applying case-by-case assessment of whether expert testimony is required to establish mental incapacity in rape case). As the *Collins* court explained:

"Whether expert testimony as to a victim's mental or physical capacity to resist or to appraise the nature of the perpetrator's conduct is indispensable in a prosecution [for sexual assault] must be approached on a case-by-case basis. In those cases such as the present case, where no expert testimony is provided, a court must examine the evidence and determine whether the nonex-

pert testimony is of sufficient probative value to justify a rational finding that the victim was mentally or physically incapable of resisting or appraising the actor's conduct." *Id.* at 350–51.
The defendant relies on *State v. Call*, 139 N.H. 102, 650 A.2d 331 (1994) to support his position that expert testimony is required to establish a rape victim's alleged incapacity. In *Call*, however, the New Hampshire Supreme Court stopped short of adopting a *per se* rule requiring expert testimony; it simply held that expert testimony was required in that case and that "the evidence must be sufficient to establish that the victim was incapable of legally consenting." *Id.* at 332. Given the lack of evidence concerning the victim's mental state, the conviction was reversed. However, based on the evidence presented in this case, including Colantuono's testimony, we are convinced that the state properly established Jane's mental disability.

12. In addition to testifying that Jane did not have the ability to make informed decisions regarding sexual contact, Colantuono also said that, because of her disability, it would be "very difficult" for her to consent to a sexual relationship. Furthermore, other jurisdictions have held that non-expert testimony, including the testimony of a complaining witness, may be sufficient to establish mental disability. *See supra*, note 11.

nor any other witness as an expert. He further contends that the trial justice failed to properly exercise his discretion by not making a preliminary determination as to whether Colantuono was qualified as an expert.

The disputed jury instruction was as follows:

"The Rules of Evidence ordinarily do not permit witnesses to testify as to opinions or conclusions."

"We make an exception to this rule as to those whom we refer to as expert witnesses. Witnesses who by education or experience have become well versed in some profession may offer their opinions as to relevant and material matters in which they profess to be expert and they may also state the reasons for their opinion. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience or if you should conclude that the reasons given in support of the opinion are not sound or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely. You should consider any expert testimony and give it such weight as you think it deserves."

Although Colantuono gave his "professional opinion" concerning Jane's mental state, Gardiner contends that, because Colantuono never was presented as an expert or formally declared an expert by the court, he was denied the opportunity to object. We agree with defendant that in this jurisdiction, the usual procedure for expert testimony includes a formal tender of witnesses intended to testify as experts. Under the circumstances here, however, we need not determine whether the failure to follow this procedure was prejudicial because defendant failed to make a timely objection to Colantuono's testimony, including his opinion testimony, which was based on his professional experience.

Indeed, Colantuono's testimony began with a recitation of his educational and professional backgrounds. As his testimony continued, the prosecutor repeatedly asked for his professional opinion, each time without objection from defendant. On cross-examination, defendant successfully argued that because Colantuono was testifying as an expert, he should be permitted to testify on matters to which he lacked firsthand knowledge. *See* Rule 703 ("Bases of opinion testimony by experts"). It is strikingly inconsistent for defendant to now argue that he was denied an opportunity to challenge Colantuono's qualifications when he himself argued for the admission of Colantuono's expert testimony.

In *State v. Ashness*, 461 A.2d 659, 669 (R.I.1983), a prosecution witness gave expert testimony concerning firearms identification, even though the state had not offered the witness as an expert beforehand. When the witness finished his testimony, the defendant moved to strike it, but the trial justice ruled that the objection was untimely. On appeal, we held that the lack of formal tender of the witness as an expert was not prejudicial, and we agreed with the trial justice that the objection was untimely because challenges to the witness's qualifications should have been made sooner.

The defendant posits that *Ashness* is distinguishable from the present case because the expert witness in that case had extensive qualifications, but Colantuono's qualifications, he says, are lacking. This argument, however, overlooks the fact that our holding in *Ashness* did not turn on the witness's qualifications; rather, it hinged on the failure to object in a timely fashion. Gardiner's objection to Colantuono's testimony was not made until his motion for judgment of acquittal, made pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, after the state had

rested. Thus the timing of Gardiner's objection was even more untimely than the objection made in *Ashness*.

Despite the lack of timely objection, we noted in *Ashness* that the expert witness was, in fact, well qualified. Likewise in this case, we are satisfied that Colantuono also was qualified in his field,[13] and we do not agree that the trial justice's failure to formally declare him an expert for the purpose of giving expert testimony amounts either to a failure to exercise discretion or an abrogation of the trial justice's gatekeeping function. When he denied defendant's Rule 29 motion, the trial justice made clear that he was satisfied with Colantuono's qualifications.[14]

■ Finally, defendant argues that the trial justice's instruction impermissibly vested the jury with the responsibility of determining whether Colantuono was qualified as an expert.[15] The disputed jury instruction stated in part that "if [the jurors] should decide that the opinion of an expert witness is not based upon sufficient education and experience * * * [they] may disregard the opinion entirely," and that the jurors should "give [expert testimony] such weight as [they] think it deserves." Essentially, defendant's argument confuses weight with admissibility—the former being a task for the jury, the latter a task for the trial justice. *See State v. D'Alessio*, 848 A.2d 1118, 1123–24 (R.I.2004) (noting that the extent of an expert witness's training was a question of weight, not admissibility). We see nothing wrong with the trial justice's instruction, and therefore we reject defendant's contention.

### E. Exclusion of Testimony

■ Gardiner next asserts that the trial justice erred by excluding testimony from Mendelsohn, a nurse who treated Jane, about her concern that Jane may become sexually active. During a *voir dire* proceeding relative to her proposed testimony, Mendelsohn said, outside the presence of the jury, that she thought Jane should be prescribed birth control pills to regulate her menstrual cycle and to protect her against pregnancy in the event that she became sexually active. According to Gardiner, this testimony was relevant because it tended to show that Jane was capable of consent. The trial justice disa-

13. Rule 702 of the Rhode Island Rules of Evidence provides:

> **"Testimony by experts.**—If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

In *Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1061 (R.I.2001), we explained that under Rule 702, "[a]n expert need not have a license in a narrow specialty, nor hold a particular title, as long as his or her 'knowledge, skill, experience, training, or education' can deliver a helpful opinion to the fact-finder."

14. Perhaps it would have been helpful for the trial justice to state this finding sooner by formally declaring the witness an expert. But the fact that he did not do so does not equate to a lack of qualification of the witness.

15. In addition to contesting the trial justice's expert-witness instruction to the jury, defendant notes that during a sidebar conversation, the trial justice commented that "the Court is not to identify any particular witness as an expert witness, because in a way, that would mean that the Court would vouch for that witness * * *." Although we agree that this is an incorrect proposition of law, the record indicates that the trial justice had, in fact, evaluated Colantuono's qualifications, even though he did not articulate his assessment of the witness until after the expert testimony was given. Moreover, this comment was not made in the presence of the jury, and the trial justice did not instruct the jurors that whether a witness is qualified as an expert was for them to decide.

greed, however, because Mendelsohn never actually discussed sexual issues with Jane. Although the two women generally had discussed Jane's interest in forming relationships with some of her peers, these conversations never included any discussion of whether Jane was interested in sexual relations. Thus, the trial justice held that testimony regarding Mendelsohn's concern that Jane might engage in sexual relations was speculative, and thus not admissible. The defendant argues that the trial justice's exclusion of this testimony was an abuse of discretion and violated his constitutional right to call witnesses and present a defense.

It is well settled that decisions on the admissibility of evidence on grounds of relevance are left to the sound discretion of the trial justice. *State v. Botelho*, 753 A.2d 343, 350 (R.I.2000). "We shall not disturb such a decision on appeal absent an abuse of discretion." *Id.* Our review of the record convinces us that the trial justice did not abuse his discretion when he ruled that Mendelsohn's proposed testimony was inadmissible. Jane never expressed an interest in having sexual relations to Mendelsohn, nor had the two women even discussed sex. We agree with the trial justice that Mendelsohn's concern that Jane might become sexually active in the future was too speculative to constitute admissible evidence.[16]

## F. Jury Instruction on Sexual Assault

Justice GOLDBERG, for the Court with respect to Part II–F, from the reasoning of which Justice FLAHERTY dissents, while concurring in the judgment.

The last issue that the defendant raised in this appeal concerns the trial justice's instruction to the jury on the element of force or coercion necessary to establish first-degree sexual assault. The indictment returned in this case charged that defendant engaged in sexual penetration, "by force and coercion and knowing or having reason to know that the victim was mentally disabled," in violation of G.L.1956 § 11–37–2 and § 11–37–3.

In his brief to this Court, defendant acknowledged that Jane's testimony was sufficient to establish sexual penetration by force and, through Driscoll's testimony, defendant conceded that "the state presented evidence of sexual relations between a staff member and a resident, from which the jury could find the use of a position of authority to coerce submission to sexual activity." Additionally, although defendant questioned whether the testimony of Steven Colantuono qualified as expert opinion,[17] he conceded that there was evidence that the complainant was mentally disabled sufficient to support first-degree sexual assault upon a mentally disabled victim. On appeal, defendant challenges the fact that the trial court gave *any* instructions relative to the crime of first-degree sexual assault "on a theory of using threats of violence—a theory wholly unwarranted by the evidence." After careful review of the record in this case, including the colloquy between counsel and the trial justice at the close of the instructions, we conclude that this issue was not preserved for appellate review. Further, because defendant, in his written requests to charge the jury, requested an instruction on this very issue, we deem the issue waived.

---

**16.** *Also, we fail to see how a prescription for birth control pills has any bearing whatsoever on the issue of Jane's ability to consent. It is just as likely that the prescription was neces-* sary because she might engage in sexual relations, even without the capacity to consent.

**17.** *See* Part II–C, *supra*.

## Failure to Preserve

We begin by noting that during his charge to the jury, the trial justice used written jury instructions that were provided to counsel but not made a part of the record in this case.[18] The colloquy between counsel and the court at the close of the instructions made specific reference to page 15 of the court's instructions. The record of sidebar conference is as follows:

"[COUNSEL]: I objected to the instruction on Your Honor's Page 15 with regards to force and coercion. I think that last sentence is confusing to the jury. It actually takes away any kind of finding of force and coercion that they would have to make.

"THE COURT: How about the factual situation that someone in your client's position gave the victim the evil eye and drew his finger across his throat to indicate if she didn't go along with it, she was going to—that would be an implied threat that might put someone in reasonable fear. That's the state of the law. I don't think it's confusing at all.

"[COUNSEL]: But that's not the testimony.

"THE COURT: I agree, but this is the stock instruction.

"[COUNSEL]: I don't recall that being the testimony of the victim.

"THE COURT: It's not. With respect to Page 15, are you suggesting some alteration or modification or correction?

"[COUNSEL]: In the example you gave, I wouldn't have any objection to it. The testimony—

"THE COURT: Right now it's eleven o'clock in my courtroom. You have the jury right behind you. What if any correction do you want to Page 15?

"[COUNSEL]: At the present time, I think you have to make an instruction to the jury to say that—I can't—to say that—I don't know if you could make one that could create—clear up this instruction because you have said that she may not have actually heard any threatening words.

"THE COURT: I'm asking you whether or not you can create one so that I can make your—if your client was—if my instruction was defective—

"[COUNSEL]: At this time I don't have one.

"THE COURT: Anything else?

"[COUNSEL]: No."

The record before the Court does not include the last sentence on page 15 or any part of the trial justice's written instructions, nor has either party produced the written instructions. We decline to speculate about page 15 or any other portion of that missing document. It is counsel's responsibility to include such appropriate materials as will assist this Court in examining the issues raised on appeal. *See State v. Morris*, 863 A.2d 1284, 1289 (R.I. 2004) (Court will decline to address the merits of the claim if the appealing party fails to provide documents on which an assignment of error rests.); *State v. Pineda*, 712 A.2d 858, 860 (R.I.1998) (An incomplete record on appeal precludes meaningful review such that Supreme Court will uphold the rulings of the trial court.). When a party fails to file a complete record with the Court, we shall affirm the trial court.

Furthermore, consistent with our holding that this issue was not appropriately

---

**18.** It is incumbent upon the trial justice to make part of the record any written document provided to counsel, including a copy of his or her instructions.

preserved, the state contends that the basis of defendant's objection is unclear. Defense counsel alleged that "the last sentence [on page 15 was] confusing to the jury" and "actually takes away any kind of finding of force and coercion that they would have to make." We agree with the state; this objection to the trial justice's charge is neither clear, nor explicit; particularly because the contention on appeal is that any instruction on coercion by threats amounts to reversible error.

We deem the discussion at the sidebar between defense counsel and the court to be so vague and confusing as to amount to a waiver of appellate review. This Court consistently has held that it is counsel's responsibility to carefully listen to the trial court's instructions to the jury and "to point out to the judge specifically any corrections or additions that are necessary." *State v. Lynch,* 854 A.2d 1022, 1034 (R.I. 2004). In accordance with Rule 30 of the Superior Court Rules of Criminal Procedure, when posing an objection to an instruction, a party must state "distinctly the matter to which the party objects and the grounds of the party's objection." *Lynch,* 854 A.2d at 1034 (quoting Rule 30). It is well established that a general objection to an instruction, " 'without specific grounds, [is] not a sufficient basis for review by this Court.' " *State v. Ibrahim,* 862 A.2d 787, 795 (R.I.2004).[19] Moreover, as we shall discuss, defendant submitted a written re-

quest for an instruction on force and coercion that is identical to the instruction given at trial.

### Waiver

Although defendant assigns error to the trial justice's instruction "on a theory of using threats of violence—a theory wholly unwarranted by the evidence[,]" in his written request to charge, defendant specifically requested that the jury be charged as follows:

*"REQUEST NO. 12*

"Force or coercion means when the accused does any one of the following:

"(i) Uses or threatens to use a weapon, or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon.

"(ii) Overcomes the victim through the application of physical force or physical violence.

"(iii) Coerces the victim to submit by threatening to use force or violence on the victim and the victim reasonably believes that the accused has the present ability to execute these threats.

"(iv) Coerces the victim to submit by threatening to at some time in the future murder, inflict serious bodily injury upon or kidnap the victim or any other person and the victim reasonably believes that the accused has the ability to execute this threat."

19. Counsel's inability to provide the trial justice with wording that might remedy what counsel perceived to be defective in the court's instructions is especially noteworthy. It is the role of the attorney to formulate what he or she considers to be appropriate language. *See Fogarty v. Near North Insurance Brokerage, Inc.,* 162 F.3d 74, 79–80 (2d Cir. 1998) (holding that counsel's failure to offer alternative language for jury instruction waived the right to make that instruction the basis for an appeal); *United States v. Phillips,* 522 F.2d 388, 391 (8th Cir.1975) (holding that

defendant's tender of an alternative instruction, without explaining why his requested instruction better states the law limited the court's review of the jury instructions). *Cf. Bajakian v. Erinakes,* 880 A.2d 843, 848 n. 7 (R.I.2005) (responsibility of suggesting redaction or cautionary instruction falls on the proponent); *State v. Grayhurst,* 852 A.2d 491, 518 (R.I.2004) (counsel's failure to remind trial justice to give jury instruction that was previously agreed upon constituted a failure to preserve the issue for appellate review).

Before this Court, defendant contends that the "disputed instruction" permitted the jury to find that defendant compelled the complainant to submit by "threatening to use force or violence" if she "reasonably believed that [defendant] had the present ability to carry out such threats." The defendant also argues that it was error to "instruct[ ] the jury that it could find guilt based on threats" because "there was no evidence of any threats" by defendant, "either express or implied[.]" However, this is an instruction that defendant specifically requested.

The defendant seeks reversal of his conviction based on his contention that the record is devoid of evidence to support an instruction on first-degree sexual assault by coercion or by threat. Notably absent from this argument is an explanation of the basis for requesting just such an instruction. Because defendant proposed the very instruction he now assigns as reversible error, we reject his argument. We are satisfied that this issue was waived; a defendant may not challenge in the Supreme Court a jury instruction that he asked be given in the trial court.

In conclusion, because we are of the opinion (1) that the defendant failed to provide so much of the record as to facilitate proper appellate review and (2) that he had requested an instruction on the elements of force and coercion, a majority of the Court concludes that the defendant's challenge to the jury instruction is not appropriately before the Court.

## III

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice FLAHERTY, dissenting in part II–F, but concurring in the judgment.

Although I concur in the majority's holding on this portion of the opinion, I respectfully dissent from its reasoning.

First, I disagree with the majority that defendant's failure to provide this Court with "page 15" of the trial court's charge precludes a meaningful review of his objection to the trial justice's instructions concerning force and coercion. Although I agree that it is the obligation of a party who claims error to furnish a sufficient record so that the merits may by weighed, in my opinion, defendant's objection is sufficiently clear from the transcript that he provided for our review. It is apparent from the on-the-record colloquy between counsel and the trial justice that defendant objected to the justice's instruction concerning implied threats because there was no evidence of implied threats presented at trial.[20] This Court previously has explained that "[i]n the absence of the transcript or other adequate record of the proceedings in the court below, we are unable to consider the issues raised by defendant's appeal." *State v. Jennings*, 117 R.I. 291, 294, 366 A.2d 543, 545 (1976). Although it is true that defendant failed to produce "page 15" of the instructions, he nevertheless provided an adequate record, which is all that he was required to do. *See State v. Udin*, 419 A.2d 251, 263 (R.I.1980) (although defendant's failure to provide complete transcript "hampered our inquiry," the record was nevertheless adequate to assess the merits of his argument on appeal).

---

20. After defendant's objection to the instruction on "page 15," the trial justice probed the merits of his objection by offering a hypothetical scenario on implied threats. Counsel responded by stating "[b]ut that's not the testimony."

Second, I do not agree that the instruction requested by defendant on force and coercion was "identical to the instruction given" by the trial justice.[21] Part II–F, *supra*. With respect to force and coercion, defendant requested the following:

"Force or coercion means when the accused does any of the following:

"(i)  Uses or threatens to use a weapon, or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon.

"(ii)  Overcomes the victim through the application of physical force or violence.

"(iii)  Coerces the victim to submit by threatening to use force or violence on the victim and the victim reasonably believes that the accused has the present ability to execute these threats.

"(iv)  Coerces the victim to submit by threatening to at some time in the future murder, inflict serious bodily injury upon or kidnap the victim or any other person and the victim reasonably believes that the accused has the ability to execute this threat."

In contrast to defendant's requested instruction on the issue of force and coercion, the trial justice's instruction contained language concerning implied threats. The trial justice instructed the jury as follows:

"Force or coercion means overcoming the victim through the application of physical force or violence against her will and without consent. It also includes compelling the victim to submit by threatening to use force or violence and the victim reasonably believed that the defendant had the present ability to carry out such threats."

"The State need not prove that the defendant actually or by words spoken expressly threatened [Jane] because a threat may be implied as well as expressed. In other words, [Jane] need not have actually heard any threatening words in order for her to have been reasonably in fear of her assailant."

It is noteworthy that contained in the trial justice's instruction, but absent from defendant's request, is language concerning implied threats. Therefore, I do not believe that Gardiner has waived his right to appeal on this issue.

Because Gardiner raised a timely objection, provided an adequate record of that objection, and did not waive his right to appeal this issue by requesting a similar instruction, I believe it is the obligation of this Court to assess the merits of his argument.

This Court previously has explained that "[w]hen instructing the jury, the trial justice 'should reasonably set forth all of the salient and essential propositions of law that relate to material issues of fact which the evidence tends to support.'" *State v. Fisher*, 844 A.2d 112, 116 (R.I.2004) (quoting *State v. LaRoche*, 683 A.2d 989, 996–97 (R.I.1996)). We also have cautioned that "[t]he jury's attention should not be directed to various propositions of law unless the record contains evidence which supports and requires it.'" *Id.*; *see also Anter v. Ambeault* 104 R.I. 496, 500, 245 A.2d 137, 139 (1968) ("it is improper for a trial justice to give [jury] instructions which are unsupported by the evidence in the record").

Gardiner does not challenge the legal accuracy of the trial justice's instruction that force or coercion may be based on

---

**21.**  Indeed, the record contains defendant's requested instruction with the trial justice's handwritten "No" in the margin.

express or implied threats, but instead argues that the instruction was improper in this case because there was no evidence that would support a conviction based on the use of threats. He maintains that his conviction should be reversed because the jury returned a general verdict, and therefore his conviction may be based on grounds not supported by the evidence.

It is apparent from the record that the testimony at trial does not support a finding of guilt based on the theory that Gardiner used implied threats to compel Jane's sexual submission.[22] Therefore, the trial justice's instructions to the jury should not have included this extraneous proposition of law. To evaluate the impact of this instruction, however, it is necessary to distinguish between jury instructions that are legally insufficient and those that are not factually supported by the evidence.

To support his argument that the trial justice's instruction on threats justifies reversal of his conviction, defendant relies on *State v. Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994), a case factually similar to the case before us. In that case, the Supreme Court of Connecticut upheld a defendant's conviction after the trial justice instructed the jury that it could convict him for sexual assault if it found that he had compelled the victim's sexual submission either by force or threat of force. Like Gardiner, Chapman argued that reversal of his conviction was warranted because the evidence did not support a conviction based on threats. Relying on an earlier Connecticut case, *State v. Williams*, 202 Conn. 349, 521 A.2d 150 (1987), Chapman contended that instructing the jury on a factually unsupported theory of guilt was a violation of due process. However, the Supreme Court of Connecticut noted that

after *Williams* was decided, the United States Supreme Court clarified the distinction between legally insufficient and factually insufficient jury instructions. *See Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Because the instruction in *Chapman* was the latter, the court rejected Chapman's argument and upheld his conviction.

In *Griffin*, the United States Supreme Court rejected the petitioner's argument that her conviction should be set aside because the jury returned a general verdict after it was instructed that it could convict based on alternate grounds, one of which was not supported by the evidence. The Court explained:

"When * * * jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence * * *. 'It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.'" *Griffin*, 502 U.S. at 59–60, 112 S.Ct. 466 (quoting *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir.1991)).

The distinction between factually insufficient and legally insufficient jury instructions was central to this Court's holding in

---

**22.** I agree with the majority that because Gardiner requested a charge that contained an express threat element, he has waived any objection thereto, whether supported by the evidence or not.

*State v. McLaughlin,* 621 A.2d 170, 176 (R.I.1993), in which we vacated a defendant's involuntary manslaughter conviction and rejected the state's argument that the jury instruction at issue was factually insufficient rather than legally incorrect. In that case, the jury was instructed that it could convict the defendant for manslaughter based on two alternate grounds, one of which was criminal negligence. We held that it was legally incorrect for the trial justice to instruct on criminal negligence in the absence of a legal duty to act on behalf of the deceased victim.

In this case, however, the trial justice's instruction to the jury on sexual assault by use of implied threats was legally correct, even though conviction on such grounds was not supported by the evidence. But sufficient evidence was presented at trial to support a conviction based on penetration by force, coercion, or lack of consent because of Jane's mental disability. In light of this evidence, it is highly improbable that the jury, which was required to unanimously agree not only on a verdict but also its reasoning,[23] decided to convict Gardiner based upon a theory of guilt that was wholly unsupported by the evidence. *See State v. Chapman,* 229 Conn. 529, 643 A.2d 1213 (1994). For this reason, I do not believe that the trial justice's instruction to the jury warrants reversal of his conviction, and therefore concur in the Court's holding.

---

**23.** At the urging of defense counsel, the trial justice clarified that to find defendant guilty, the jurors must be unanimous not only in the result, but also in their reasoning. The trial justice explained that:

"[there are] two separate ways that the State can proceed to prove the defendant guilty beyond a reasonable doubt. You may find that the State has proved one or the other or both, but your verdict must be unanimous[ ]* * *. All 12 [jurors] must agree on the means by which the statute was violated."